IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 12-cv-00655-RBJ

JEFFREY BELLMAN, an individual and
THOMAS R. SAMUELSON, an individual,

      Plaintiffs,

v.

I3CARBON, LLC, a Colorado limited liability company,
PATRIC GALVIN, an individual,
ROBERT HANFLING, an individual,
FAISAL SYED, an individual,
CHRISTOPHER GALVIN, an individual,
REBECCA GALVIN, an individual, and
DAVID SUNSHINE, an individual,

      Defendants.

---

## ORDER

---

This Order addresses all pending dispositive motions except the motion for summary judgment filed on behalf of defendants Robert Hanfling, Faisal Syed and David Sunshine.

## **BACKGROUND**

Plaintiffs allege that they were duped into investing money in defendant i3Carbon, LLC by false and misleading representations for which all defendants were responsible. Specifically, they allege i3Carbon was formed in June 2010 for the purposes of acquiring or developing coal and other resources, and selling such resources in India. Amended Complaint [ECF No. 18] at ¶16. Plaintiffs were approached by defendant Patric Galvin, an officer, member of the Board of Directors, and controlling person of i3Carbon, about their possible interest in investing in the company. *Id.* at ¶¶4, 17, and 18. The company provided a binder of information including a

1

business plan, projections, a list of coal resources, and documents about an imminent acquisition of another company that held substantial properties in Botswana. *Id.* at ¶19.

The business plan represented that the company had agreements in place for infrastructure and obtaining new resource opportunities; offers of production of more than two billion metric tons of coal products; a pipeline for sales for mines in the U.S., Columbia and Botswana; agreements to supply $900 million of copper per year to India; the ability to deliver five million metric tons of coal per year, increasable to 15 metric tons; a budget permitting shipment of products within 30 days; a line of credit from Deutsche Bank of 1.5 billion euros and a secondary line of credit of 500 million euros; 1.8 billion metric tons of current coal resources in committed acquisition process; a team experienced in operations, finance, technology, transportation, and logistics; and that the former chairman of Coal India, Dr. Narayanan, was a current member of i3Carbon's Board of Directors. *Id.* at ¶20. Dr. Narayanan's membership on the Board was said to insure Coal India's commitment to purchase coal and other resources from i3Carbon. *Id.* at ¶21.

Plaintiffs allege that an income statement in the binder represented that i3Carbon would have net revenues/net earnings of approximately $72.4 million/$40.9 million in Year One; $87.4 million/$43.6 million in Year Two; and $132.4 million/$60.8 million in Year Three. *Id.* at ¶22.

Plaintiffs allege that, in addition to Patric Galvin, defendants Robert Hanfling and Faisal Syed were members of the Board of Directors, officers and controlling persons. *Id.* at ¶¶5, 6 and 17. Defendant David Sunshine was an advisor to the company and to Galvin, Hanfling and Syed, including being a member of the company's Board of Advisors. *Id.* at ¶¶11, 17. Hanfling, Syed and Sunshine all participated in the drafting and providing of material information for the

written materials in the investment binder. *Id.* at ¶23.  Christopher Galvin and Rebecca Galvin are alleged to have been additional controlling persons and officers of i3Carbon.

Plaintiffs also allege that by means of telephone conversations and emails during the period October through December 2010 Patric Galvin on behalf of i3Carbon continued to represent to the plaintiffs that the company had existing coal resources in place from mines in the U.S., Colombia and Botswana for continued sales to India; and that the company was authorized by Patriot Coal to sell 2.5 million metric tons per year of coal and steam coal products for a $5.6 million profit to i3Carbon. *Id.* at 24, 25.

Plaintiffs allege that in reliance on these representations, plaintiff Samuelson invested $225,000 in cash and $125,000 in kind, and that plaintiff Bellman invested $250,000 in cash, receiving in exchange limited liability company units of i3Carbon. *Id.* at 26-29.

However, according to the plaintiffs, all of these representations were false and misleading.  In fact, i3Carbon had no agreements in place for infrastructure, coal resources, or copper products for sale to India.  It had no ability to deliver five million metric tons of coal or the ability to ship within 30 days.  It had no line of credit from Deutsch Bank and no secondary line of credit.  It had no agreement imminently to acquire property in Botswana or elsewhere. Dr. Narayanan was not a member of i3Carbon's Board of Directors.  The company was not authorized by Patriot Coal to sell any of its coal products. *Id.* at ¶31.  The company's only income was the nearly $1 million invested by the plaintiffs and other investors.  Those investment funds were mostly paid to the company's officers, directors and advisors (or companies controlled by those individuals) as "consulting fees," even though there were no consulting contracts, the company received no tangible benefit from the "consultants," and

defendants did not disclose the intent to distribute the investment funds to themselves.  *Id.* at 32-33, 36.

Plaintiffs filed this lawsuit on March 14, 2012.  In their Amended Complaint they assert claims sounding in (1) violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (securities fraud) against Patric Galvin and i3Carbon; (2) violation of section 20(a) of the Securities Exchange Act of 1934 (controlling person liability) against each individual defendant other than Mr. Sunshine; (3) violation of the Colorado Securities Act (securities fraud) against Patric Galvin and i3Carbon; (4) violation of the Colorado Securities Act (controlling person liability) against all individual defendants except Mr. Sunshine; (5) violation of the Colorado Securities Act (aiding and abetting liability) against Rebecca Galvin and Mr. Sunshine; (6) negligent misrepresentation against Patric Galvin and i3Carbon; (7) civil theft against Patric Galvin and i3Carbon; and (8) common law fraud against Patric Galvin and i3Carbon.  *Id.* at ¶¶37-79.[1]

In May 2012 defendants moved to compel arbitration pursuant to an arbitration clause in an Operating Agreement that was included in the investment binder (but never signed by either plaintiff).  This Court denied the motion in June 2012.  Defendants appealed.  The Tenth Circuit issued its order affirming the denial of the motion to compel arbitration on May 29, 2014 and its mandate on June 20, 2014.  ECF Nos. 48, 53.  This Court then set a seven-day jury trial to begin July 20, 2015.  The pending dispositive motions were filed in April 2015, and with the exception of ECF Nos. 71 and 72, briefing has been completed.

---

[1] Two other individuals, Jack Bonaquisto and Conrad Shillingburg, were also named as defendants, but the claims against them have been dismissed.

## FINDINGS AND CONCLUSIONS

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party produces evidence suggesting that there is no genuine dispute of material fact, the opposing party must produce some evidence to the contrary.  *See* Rule 56(c).  The evidence and inferences that might reasonably be drawn from the evidence are viewed in the light most favorable to the non-moving party.  *Riser v. QEP Energy*, 776 F.3d 1191, 1195 (10th Cir. 2015.

### A.  **Defendant Patric Galvin's Motion for Partial Summary Judgment (in which defendant i3Carbon joins) [ECF No. 66].**

In this motion Mr. Galvin contends that Mr. Samuelson's claims are all based on allegedly false or misleading statements in the investment binder, and that because he made two investments in i3Carbon before he was given the binder, he could not have relied on the fraudulent statements in making those investments.  He submits evidence that Mr. Samuelson invested $25,000 in cash and $125,000 "in kind" (a stock transfer) on August 2, 2010, and that he couldn't have received the binder before August 25, 2010, because the binder contained financial data printed on August 25, 2010.

Plaintiff's evidence in response is that in early August 2010 Patric Galvin contacted Mr. Samuelson and solicited an investment in i3Carbon.  During their conversation Mr. Galvin described a May 10, 2010 meeting in New York attended by influential people from Coal India and from U.S. coal companies that could supply coal to Coal India.  Mr. Samuelson made a $25,000 equity investment in i3Carbon on August 2, 2010 to help fund a trip by Mr. Galvin to

5

India to finalize coal sale contracts.  Christopher Galvin acknowledged receipt of the $25,000 and sent Mr. Samuelson an investment document shortly thereafter.

Shortly after returning from the trip – but still in the first half of August 2010 -- Patric Galvin contacted Mr. Samuelson and told him that contracts for i3Carbon to supply coal from its contacts to India and collect a commission were secure, and that Dr. Narayanan, the former coal chairman of India, would be on i3Carbon's Board.  At that time Mr. Galvin provided the investment binder to Mr. Samuelson.  On September 14, 2010 Mr. Samuelson invested another $200,000 in cash, and on September 22, 2010 i3Carbon accepted Mr. Samuelson's interest in another company as an in-kind investment valued at $125,000.[2]

In reply Patric Galvin provides a copy of i3Carbon financial records, dated as of August 31, 2010 and September 30, 2010, suggesting that Mr. Samuelson had transferred or had at least decided to transfer WER SalGas stock (his in-kind investment) by August 2, 2010 and confirming his additional $200,000 cash investment as having been made on September 14, 2010.[3]

The Court finds that these records show the existence of genuine issues of material fact, i.e., did Mr. Samuelson rely on representations of Patric Galvin when he made (or decided to make) his initial $25,000 cash investment and his $125,000 in-kind investment in i3Carbon; what were those representations; when were they made; and, implicitly, whether the representations were false or misleading.  Accordingly, Mr. Galvin's motion for partial summary

---

[2] Plaintiffs' evidence includes excerpts from Mr. Samuelson's deposition; a copy of the report on the May 10, 2010 meeting which was held in defendant Syed's house and was attended, among others, by Patric Galvin, Christopher Galvin, David Sunshine and Mr. Syed; an i3Carbon bank record; an email exchange between Mr. Samuelson and Christopher Galvin; and a Resolution singed by i3Carbon's Managing Member.

[3] The Reply also argues that even the $200,000 cash investment, not included in the motion, should be included in the motion, thus making it a complete, not a partial, motion for summary judgment as to the claims of Mr. Samuelson.  It is inappropriate to assert an argument for the first time in a reply brief.

judgment is denied.  Defendant i3Carbon joined in this motion.  *See* ECF No. 69.  Accordingly,

i3Carbon's motion by joinder is also denied.

    **B.**  **Defendants Christopher Galvin and Rebecca Galvin's Motion for Summary Judgment [ECF No. 67].**

    Christopher Galvin and Rebecca Galvin move for summary judgment dismissing the

Second Claim (controlling person liability under the Securities Exchange Act of 1934) and

Fourth Claim (controlling person liability under the Colorado Securities Act).  Rebecca also

seeks summary judgment dismissing the Fifth Claim (aiding and abetting under the Colorado

Securities Act).

    1.  <u>Controlling Person Liability under the Securities Exchange Act of 1934</u>.

    These defendants claim that neither of them was a "controlling person" with respect to

i3Carbon or any other defendant.[4]

    Section 20(a) of the Act states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

    Thus, to establish a prima facie case of controlling person liability, plaintiffs must

establish both a primary violation and "control" over the primary violator.  *Maher v. Durango*

*Metals, Inc.,* 144 F.3d 1302, 1305 (10th Cir. 1998).  If both elements are established, then the

burden shifts to the defendant to show "lack of culpable participation or knowledge."  *Id.*

"Control" means "the possession, direct or indirect, of the power to direct or cause the direction

---

[4] They also claim that they lacked scienter, but they do not develop that argument other than by incorporating "facts, evidence, authorities and arguments" filed by other defendants.

of the management and policies of a person, whether through the ownership of voting securities,

by contract, or otherwise." 17 C.F.R. § 230.405. The statute is remedial and "has been

interpreted as requiring only some indirect means of discipline or influence short of actual

direction to hold a 'controlling person' liable." *Maher,* 144 F.3d at 1305 (citing *Richardson v.*

*MacArthur,* 451 F.2d 35, 41-42 (10th Cir. 1971)).

In support of the motion, these defendants submit deposition testimony of Christopher

Galvin, Mr. Samuelson, Mr. Bellman, and Rebecca Galvin. They contend that this testimony

establishes that there is no genuine dispute of fact that needs to be tried in order to determine that

they cannot be found liable as controlling persons.

2. Controlling Person Liability under the Colorado Securities Act.

The Colorado Securities Act's provision on controlling person liability, C.R.S. § 11-51-

604(5)(b), is nearly identical to section 20(a) of the Securities Exchange Act of 1934. To

establish controlling person liability under the Colorado Securities Act the plaintiff must

establish a primary violation of the securities laws and "control" by the defendant. *In re Stat-*

*Tech Securities Litigation,* 905 F. Supp. 1416, 1429 (D. Colo. 1995). Here, both parties agree

that the same standards apply under the federal and state statutes. Motion [ECF No. 67] at 9-10;

Response [ECF No. 80] at 7.

3. Aiding and abetting liability under the Colorado Securities Act.

Under the Colorado Securities Act,

Any person who knows that another person liable under subsection (3) or (4) of
this section is engaged in conduct which constitutes a violation of section 11-51-
501 and who gives substantial assistance to such conduct is jointly and severally
liable to the same extent as such other person.

C.R.S. 11-51-604(5)(c).[5]

The parties do not cite, and the Court has not found, Colorado state appellate decisions interpreting this provision. However, at a minimum a plaintiff must establish that the defendant (1) knew that another person was engaging in conduct that would constitute fraud or other unlawful conduct in the sale of a security, and (2) gave substantial assistance to the perpetration of the conduct. It is not necessary that the alleged aider and abettor knew that the investment was a security. *People v. Rivera,* 56 P.3d 1155, 1163 (Colo. App. 2002). *See Stat-Tech Liquidating Trust v. Fenster,* 981 F. Supp. 1325, 1339 (D. Colo. 1997).

4. Claims against Christopher Galvin.

Mr. Galvin, Patric Galvin's brother, was Director of Marketing/Communications. He claims that the referenced deposition testimony establishes it to be undisputed that he had only an administrative, not a management, position. Specifically, he claims that it is undisputed that he was not a member of the Board of Directors, and he had no ownership interest in the company. His responsibilities included (1) working with outside vendors to create a marketing document, establish a website, obtain insurance coverage and negotiate an office lease; (2) coordinating meetings and conference calls; and (3) taking notes at meetings to which he was invited to attend. He was not involved in the company's substantive business, was not privy to information regarding the financial condition of the company, and had no responsibility for dealing with investors other than transmittal of written materials when directed to do so by a member of the Board of Directors. Mr. Bellman had no conversation with Christopher Galvin,

---

[5] C.R.S. § 11-51-501, the analogue to Section 10 of the Securities Exchange Act of 1934 and Rule 10b-5, prohibits securities fraud. *See People v. Rivera,* 56 P.3d 1155, 1163 (Colo. App. 2002). As relevant here, C.R.S. § 11-51-604(3) and (4) concern civil liabilities for persons who engage in fraud or other prohibited conduct in the sale of securities.

and although Mr. Samuelson did have three or four conversations with him, they took place after Mr. Samuelson made his investment.

In response plaintiffs produce evidence in the form of emails and deposition testimony indicating

- that the company's outside counsel at Sherman & Howard LLC sent copies of various company documents (finder's fee agreement, operating agreement, and other documents) to both Patric and Christopher Galvin for their review, and that Christopher reviewed them and provided comments to Patric;

- that Christopher provided wire transfer instructions to Mr. Samuelson;

- that he passed Patric's thoughts about various equity investors, including Mr. Samuelson, and how things were going for the company along to outside counsel;

- that he was working with outside vendors on marketing materials and the website (as his motion acknowledges);

- that in what appears to be a PowerPoint type set of slides about the company (in plaintiff's exhibit 22, ECF No. 76-27), Christopher is listed as part of the "Current Team." *Id.* at Bates i3C003812];

- that he was one of four addressees of an email from outside counsel to Patric, Christopher, Mr. Sunshine, and Mr. Hanfling, with a copy to Rebecca Galvin, recommending a meeting to discuss representations to investors, the subscription agreement, and financial controls;

- that he was copied on another email exchange between outside counsel and Jack Bonaquisto (a named defendant later dismissed, *see supra* n.1);

- that in an email to Christopher dated December 14, 2010 Mr. Hanfling noted that he had questions about the organizational chart and added, "As i understand it from Faisal's and my discussions yesterday with Pat, you have broader responsibilities than shown on the chart [ECF No. 76-44 at 1];

- he sent an email to several others, including Rebecca Galvin, with a copy to Patric Galvin, updating them on a commitment Patric had obtained from a an unnamed Tennessee investor for a $5 million investment, and reminding them that such information is highly confidential and not to be shared outside "our management team;"

- that an i3Carbon Profit & Loss statement dated November 2010 shows a "consulting fee" to Christopher Galvin of $10,000 (and consulting fees to several others including Rebecca, $10,000; Sunshine, $30,000; and Patric, $39,000); and

- that as of May 30, 2011 he had been paid $40,000 in consulting fees.

In reply, defendants argue that there is no dispute concerning facts concerning Christopher Galvin. ECF No. 85. They add excerpts from the deposition of outside counsel, Paul E. Lewis, which they interpret as indicating that Mr. Lewis "considered [Christopher and Rebecca Galvin] to be merely administrative employees of the company. ECF No. 85-1. I agree that this is appears to be Mr. Lewis' opinion with respect to Rebecca. *See id.* at deposition pages 138-39. I do not find much support in the Lewis deposition for defendants' interpretation regarding Christopher.

5. Claims against Rebecca Galvin. She is Patric Galvin's wife. She contends that the deposition testimony establishes it to be undisputed that she performed secretarial, reception and clerical services for i3Carbon. Specifically, she maintained the check register and reconciled the QuickBooks register with bank statements. She signed checks when directed by a member of the

Board of Directors.  She made copies of documents provided by others and put them in investment binders.  She never had a conversation with Mr. Bellman.  Her conversations with Mr. Samuelson related to the logistics of office management and her use of the QuickBooks bookkeeping program, not anything substantive about the budget or the finances of the company.

In response, with respect to the allegation that Ms. Galvin was a "controlling person," plaintiffs produce the following evidence:

- as indicated above, that she was copied on a memo reminding the recipients not to share confidential information outside "our management team";

- as indicated above, that she was a "cc" recipient of an email from outside counsel recommending a meeting to discuss information being provided to investors and financial controls;

- that she was a third authorized check signer (with Patric Galvin and Mr. Hanfling, who was the Chairman of the Board of Directors);

- that although joint approval by Patric Galvin and Mr. Hanfling was purportedly required for payments of $10,000 or more, Ms. Galvin, either alone or with Patric, authorized wire transfers of $10,000 or more, including one to Mr. Syed of $30,000l;

- as indicated above, that she was paid a $10,000 consulting fee, according to the November 2010 Profit & Loss statement;

- that as of May 11, 2011 she had been paid $30,000 in consulting fees.

With respect to the claim of aiding and abetting liability, plaintiffs do not come forward with different or additional evidence as such.  Rather, they put their emphasis primarily on Ms. Galvin's role in maintaining i3Carbon's financial records.  Plaintiffs argue that Ms. Galvin must have known that the only income the company had was from investor capital, not revenue from

business activities.  Plaintiffs further argue that it is reasonable to infer that Ms. Galvin knew, contrary to what the plaintiffs had been told, that the company was not conducting real business, and therefore, that she knew plaintiffs were being defrauded; and that Ms. Galvin provided substantial assistance to the wrongful conduct by paying out more than a half-million dollars of investor capital to the individual defendants (presumably, the "consulting fees").  ECF No. 80 at 11.

In reply defendants suggest that the there is no dispute concerning Rebecca's role and cite the deposition testimony of the company's outside counsel, alluded to above, in which he indicates that he regarded her as an employee and probably would have booked payments to her as an expense, not a "consulting fee."  ECF No. 85-1 at deposition pages 138-39.

6. Conclusions.

Plaintiffs' evidence raises enough questions about Christopher Galvin's role that, viewing the statute regarding controlling person liability as remedial and interpreting the evidence and inferences that could reasonably be drawn in plaintiffs' favor, I find that plaintiffs have shown the existence of a genuine fact dispute sufficiently material to require denial of his motion for summary judgment.  I note in particular that he was one of four addressees of outside counsel's email recommending a meeting to discuss representations to investors, the subscription agreement, and financial controls; that Mr. Hanfling interpreted comments made in a meeting with Patric Galvin and Mr. Syed as indicating that Christopher's role in the company was broader than what the organization charts show; and that Christopher included himself in the "management team" in updating other members of that team on the status of discussions between Patric and a potentially major investor and reminding them to keep such information

confidential.  Accordingly, the motion for summary judgment dismissing the claims against Christopher Galvin (contained in the Second and Fourth Claims for Relief) is denied.

I do not reach the same conclusion with respect to Rebecca Galvin.  All of the evidence cited by either party leads to the conclusion that she was an employee who handled various administrative matters.  No matter how liberally the evidence might be construed, it does not create a fact dispute as to whether Rebecca had the power to direct or to cause the direction of the management and policies of the company or of her husband or any other member of the management team.  The motion for summary judgment dismissing the claims against her in the Second and Fourth Claims for Relief is granted.

As for the aiding and abetting claim, I likewise find that plaintiffs have not come forward with sufficient evidence to establish a genuine issue of material fact as to her knowledge that the company, her husband Patric, or others had engaged in fraudulent conduct.  There is sufficient direct and circumstantial evidence from which a reasonable jury could find that Ms. Galvin was aware of the company's financial records, including the sources of the company's income and the payments the company made to the individual defendants and others.  There is evidence from which a reasonable jury could find that Ms. Galvin knew what was contained in the investment binders.  However, plaintiffs have not produced any evidence from which a reasonable jury could infer that Ms. Galvin knew that her husband or others were soliciting investments by making misleading representations or omissions.  There is no evidence that Ms. Galvin knew that there was something improper about the consulting fees that she was directed to pay.  Guilt by association is insufficient to establish a triable case of aiding and abetting liability.  Accordingly, the motion for summary judgment dismissing the claims against Ms. Galvin in the Fifth Claim for Relief is also granted.

**C.   Defendants Patric, Christopher and Rebecca Galvin's Joinder in the Motion to Dismiss of defendants Robert Hanfling, Faisal Syed and David Sunshine [ECF No. 68].**

This "motion" is simply an advisement that the three Galvins join in the motion to dismiss of the three other defendants.  I note their wish, but to the extent they want the Court to assume that they have filed a motion to dismiss for failure to state a claim under Rule 12(b)(6), the motion is denied.  It is moot as to Rebecca Galvin.  It is untimely, as I discuss in ruling on the Hanfling, et al. motion.  Even if timely, it would fail as to Patric and Christopher Galvin, as I am satisfied that plaintiffs have stated a claim against them on which relief could be granted even under the strict standards of the Private Securities Litigation Reform Act.  And, finally, I am not inclined to consider a Rule 12(b)(6) motion at the same time that I am considering summary judgment motions filed by the same parties.

**D.   Defendant i3Carbon, LLC's Motion for Partial Summary Judgment [ECF No. 69].**

Defendant i3Carbon seeks partial summary judgment dismissing plaintiffs' First (Securities Exchange Act of 1934 and Rule 10-b(5)), Third (Colorado Securities Act) and Eighth (common law fraud) Claims for Relief.[6]  The essence of this motion is i3Carbon's contention that a subscription agreement included in the investment binder negates the materiality of the alleged misrepresentations and omissions as a matter of law, because investors acknowledged their sophistication in investment matters and represented that they solely evaluated the prospects of the company.  In other words (but words that the motion uses) *caveat emptor* – let the buyer beware.

---

[6] The motion misnumbers the claims that are the subject of this motion.  ECF No. 69 at 1.  This was corrected in the Reply.  ECF No. 88 at 1.

In the first place, plaintiff Bellman denies that he ever signed a subscription agreement, and i3Carbon has produced no evidence to the contrary.  Instead, i3Carbon suggests in its Reply that a subscription agreement should be imputed to Mr. Bellman.  ECF No. 88 at 4.  The Court would no more impute an unsigned agreement to Mr. Bellman than it would impute the plaintiffs i3Carbon's Operation Agreement, which neither plaintiff signed.  The significance of a signature was discussed in the Tenth Circuit's order on i3Carbon's interlocutory appeal in this case.  ECF No. 48.

Mr. Samuelson did sign and return a copy of a subscription agreement, entitled Subscription for Capital Partners, in August 2010.  ECF No 70-1.  That document indicates that Mr. Samuelson "hereby subscribes to purchase 800 Units, at a purchase price of $250 (the 'Subscription Funds')."  *Id.* at § 1.1.  By its terms, the document applies to a $200,000 investment.  The Court interprets the agreement, as a matter of law, to be limited to that investment and not to apply to the remainder of Mr. Samuelson's investment.

By signing that agreement Mr. Samuelson represented (and does not now deny) that he was "sufficiently experienced in financial and business matters to be capable of evaluating the merits and risks of [his] investments, and to make an informed decision relating thereto, and to protect [his] own interests in connection with the purchase of the Units."  *Id.* at § 2(c).

Mr. Samuelson represented (and does not now deny) that he understood that "the Units are not being registered under the Securities Act based on an exemption from registration provided by . . . Section 4(2) of the Securities Act."  *Id.* at § 2(e).

Mr. Samuelson represented (and does not now deny) that "in making the decision to purchase the units subscribed for, [he] has relied upon independent investigation made by [him] and [his] representatives, if any."  *Id.* at § 2.1(j).

Mr. Samuelson represented (but only in one respect denies) that prior to his investment he was "given access and the opportunity to examine all material contracts and documents relating to this offering and an opportunity to ask questions of, and to receive answers from, the company or any person acting on its behalf concerning the terms and conditions of this offering." *Id.* In his deposition Mr. Samuelson testified that he asked to see copies of the coal contracts that Patric Galvin represented were in place but was not allowed see them because the terms were considered confidential by the coal companies. ECF No. 76-7 at deposition p. 44. However, he testified that that seemed reasonable to him. *Id.*

Finally, he agreed (and does not here deny) "to indemnify and save harmless the Company from and against any and all claims, demands, actions, suits, proceedings, assessments, judgments, damages, costs, losses and expenses . . . resulting from the breach of any representation or warranty of such party under this Subscription." *Id.* at § 2.3.

What Mr. Samuelson did not do, and as a sophisticated investor probably would never do, and in any event as a matter of law could not be held to have done, was waive a claim of out and out fraud by signing this document. An exculpatory agreement that constituted such a waiver would be void as a matter of public policy.

The pending motion does not phrase defendant's argument in terms of waiver. The motion states, "Each Plaintiff promised and guaranteed in the Subscription Agreement that they relied exclusively upon their independent due diligence investigations. No statement by the Company or any Defendant, is legally *material* because each Plaintiff solely evaluated the prospects of the issuer *in connection with* their purchase of I3Carbon, LLC's Units." ECF No. 69 at 2 (emphasis in original). This vastly overstates defendant's hand. First, as discussed above, only one plaintiff signed a subscription agreement, and his subscription agreement applies

only to part of his investment.  Second, the word "exclusively" is counsel's invention.  The document relates that that "in making the decision to purchase the units subscribed for, [the Purchaser] has relied upon independent investigation made by [him] and [his] representatives, if any."  ECF No. 70-1 at § 2.1(j).  Mr. Samuelson did not agree that he would rely <u>exclusively</u> on his investigation or his own due diligence.

Contrary to defendant's argument, *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irr. Fuel Authority,* 717 F.3d 1330 (10th Cir. 1983), *cert. denied,* 465 U.S. 1026 (1984) does not support the proposition that Mr. Samuelson could not have relied on any statement made by the defendants.  Its discussion of materiality relates to a fraud on the market theory which is irrelevant here.  The case is important, however, for what it says about reliance in a securities case.  As to misrepresentations, reliance can be shown by proof that "the misrepresentation is a substantial factor in determining the course of conduct which results in . . . loss."  *Id.* at 1131.  Whether any material misrepresentations or omissions were made, and whether Mr. Samuelson relied on same, are disputed facts.  The case also reminds us that "proof of reliance is not necessary in failure to disclose cases."  *Id.* at 1333 (citing *Affiliated Ute Citizens v. United States,* 406 U.S. 128 (1972).[7]

*Zobrist v. Coal-X, Inc.,* 708 F.2d 1511 (10the Cir. 1983), on which both parties rely, was an appeal from a jury verdict, not a summary judgment, in favor of one investor and against two other investors on claims of securities fraud.  Plaintiffs, each a sophisticated investor, purchased limited partnership interests in an entity created to develop a coal property.  Defendants represented that the investment was a good opportunity and provided enticing projections.  One

---

[7] The "materiality" requirement for purposes of a § 10(b) omission claim is satisfied when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. *Matrixx Initiatives, Inc. v. Siracusano,* 131 S.Ct. 1309, 1318 (2011) (citations and internal quotation marks omitted).

of the three plaintiffs, "Phil," was also told that the investment "couldn't miss," was a "sure thing," that there were "no risks," and that they would guarantee that the investment would work out as projected – statements that in the suit he claimed were misrepresentations of material facts. Contrary to those statements, however, a Private Placement Memorandum, which was provided to the plaintiffs and which they signed but did not read, "clearly and specifically" listed several risks involved in the investment. *Id* at 1514. The jury rendered a verdict in favor of Phil but against the other two plaintiffs. The court reversed the judgment in favor of Phil and affirmed the judgments against the other plaintiffs.

Conclusions of law in the *Zobrist* case include the following of particular relevance to the present case:

- In a misrepresentation case under Rule 10b-5, a plaintiff generally must establish that the defendant, with scienter, made a false representation of a material fact upon which the plaintiff <u>justifiably</u> relied. *Id* at 1516.[8]

- Eight factors, no one of which by itself is determinative, have been identified in other circuits as relevant in determining whether an investor's reliance was justifiable:

  > (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long standing business or personal relationships; (3) access to the relevant information; (4) the existence of a fiduciary relationship; (5) concealment of the fraud; (6) the opportunity to detect the fraud; (7) whether the plaintiff initiated the stock transaction or sought to expedite the transaction; and (8) the generality or specificity of the misrepresentations. *Id.*

- An investor may not justifiably rely on a misrepresentation where its falsity is palpable.

  *Id.* at 1517.

---

[8] Liability under section 10 of the Securities Exchange Act of 1934 and Rule 10b-5 requires proof that the defendant acted with scienter, meaning "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193-94, and n.12 (1976).

- If an investor "close[s] his eyes" and intentionally refuses to investigate, in disregard of a risk that is either known to him or so obvious that he must be taken to have been aware of it, and that is so great as to make it highly probably that harm would follow, then his reliance is not justifiable. *Id.*

- A sophisticated investor's failure to read a document that makes full and fair disclosure of information required by the Securities Act of 1933 favors the defendant but is not determinative. *Id.*

- Defendants cannot disclaim responsibility for their misrepresentations simply by disclosing the risks in a document. *Id.* at 1518.

- Knowledge of information contained in a prospectus or an equivalent document required by statute or regulation should be imputed to investors who fail to read such documents. *Id.*

- Knowledge can be imputed only to the extent it was actually disclosed. *Id.*

- The successful plaintiff, Phil, provided no valid reason for reliance on general misrepresentations as to risk. He is considered to have knowledge of the specific warnings in the memorandum. Under these facts, his conduct was reckless, and he could not rely on the misrepresentations without further inquiry. *Id.* at 1518-19.

- If material facts intentionally were not disclosed, reliance can be inferred. The inference is not conclusive. Rather, it shifts the burden of proof of non-reliance to the defendant, i.e., the defendant then has the burden to demonstrate that even if the facts had been disclosed, plaintiff's investment decision would not have been different. *Id.* at 1519.

None of these points of law compels this Court to grant summary judgment in favor of i3Carbon. The case warns investors that they fail to read disclosure materials at their peril.

Here, Mr. Samuelson does not disavow the representations attributed to him in the subscription agreement, whether or not he actually read it.  He alleges that he relied on what turned out to be misrepresentations of fact, indeed, misrepresentations much more specific and factual than such puffing as "can't miss," a "sure thing," and the like.  He alleges that his reliance can be inferred with respect to material omissions of fact.

Contrary to defendant's motion at 5, *Zobrist* does not establish that because Mr. Samuelson assumed a duty to investigate, or that he cannot establish that any misrepresentations or omissions by i3Carbon or the individual defendants were material.  An investor "is not duty-bound to investigate the truth or falsity of an intentional misrepresentation unless the misrepresentation is patently false."  *Holdsworth v. Strong,* 545 F.2d 687, 694 (10th Cir. 1976).  Put another way, due diligence is not a defense "in the context of intentional conduct required to be proved under Rule 10b-5."  *Id.*  This Court concludes that whether facts were misrepresented or omitted, whether any misrepresentation or omissions were made with scienter, whether any such misrepresentations or omissions were material, and whether Mr. Samuelson justifiably relied on them, are all genuine issues of disputed fact that should be decided by the jury on appropriate instructions.

In its Reply defendant suggests that its motion "presents a single question -- whether Securities Act §4(2), 15 U.S.C. §77d(2) (2010) and Regulation D (17 C.F.R. §230.501 *et seq.)* create a duty upon the investor of investigation and informed consent."  ECF No. 88 at 1.  That was not the "single question" presented in the original motion.[9]  Nor does the Reply explain its interpretation of Regulation D.  In any event, the Court assumes for present purposes that both

---

[9] In addition to the several issues raised concerning the federal claim, the motion asked the Court to dismiss the Colorado Securities Act claim and the common law fraud claim as well.  ECF No. 69 at 1.  However, neither the motion nor the reply again mentions either of the state law claims.  Therefore, the motion is denied as to those claims without further discussion.

plaintiffs had some duty of investigation, even if not documented in a subscription agreement. That does not relieve i3Carbon or any individual defendant of the obligation not to misrepresent or omit material facts in their solicitation of plaintiffs' investments.  The company's motion for summary judgment dismissing the claims against it is denied.

## E.  **Defendants Robert Hanfling, Faisal Syed and David Sunshine's Motion to Dismiss [ECF No. 71].**

These defendants move pursuant to Rule 12(b)(6) for dismissal of the claims asserted against them for failure to state a claim upon which relief can be granted.  Plaintiffs' Second and Fourth Claims for Relief assert "controlling person" liability against Robert Hanfling and Faisal Syed under the federal and state securities laws.  The Fifth Claim asserts "aiding and abetting liability" against David Sunshine under the Colorado Securities Act.

Defendants' reply in support of this motion not yet due.  However, unlike the same defendants' motion for summary judgment, the Court can issue its order now.  This is because (1) a motion to dismiss under Rule 12(b)(6) is untimely; (2) even if deemed a motion for judgment on the pleadings under Rule 12(c) it would be denied on the face of the pleadings, at least as to Mr. Hanfling and Mr. Syed; and (3) in any event, because the same defendants simultaneously filed a motion for summary judgment, the Court will address their issues there on full briefing.

1.  <u>Untimeliness</u>.  A motion to dismiss for failure to state a claim upon which relief can be granted "must be asserted in the responsive pleading if one is required."  Rule 12(b)(6). Plaintiffs' Amended Complaint did require a responsive pleading, and these defendants filed their Answer to the Amended Complaint on June 20, 2012.  ECF No. 35.  The motion to dismiss

was not filed until April 17, 2015, simultaneously with the same defendants' filing of a motion for summary judgment. ECF Nos. 71 and 72. That is too late for a Rule 12(b)(6) motion.

2. <u>Rule 12(c)</u>. Rule 12(h)(2)(B) provides that failure to state a claim may be raised by a motion under Rule 12(c). Defendants have not requested that the motion be deemed a Rule 12(c) motion, but even if they did, I would not grant it.

A motion for judgment on the pleadings is reviewed "under the standard of review applicable to a Rule 12(b)(6) motion to dismiss." *McHenry v. Utah Valley Hosp., a Div. of Intermountain Health Care, Inc.*, 927 F.2d 1125, 1126 (10th Cir. 1991). Accordingly, the Court accepts the well-pleaded allegations of the complaint as true and draws reasonable inferences in the plaintiff's favor. Those facts must be enough to state a claim that is plausible. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Private Securities Litigation Reform Act of 1995 (PSLRA) elevates the pleading requirement somewhat for private securities actions under the Securities Exchange Act of 1934. The complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Under the PSLRA, a complaint adequately pleads scienter "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S.308, 324 (2007).

Plaintiffs allege that Robert Hanfling and Faisal Syed were officers of i3Carbon and members of its Board of Directors.  Amended Complaint [ECF No. 18] at ¶¶5, 17.  Mr. Syed was also a "Manager."  *Id.* at 14.  Mr. Sunshine provided "material information and advice" to both of them as well as to Patric Galvin.  *Id.* at ¶17.  Both gentlemen "participated in the drafting of, and provided material information for, the investment binders provided to Plaintiffs."  *Id.* at ¶23.

To establish controlling person liability, plaintiffs must establish both a primary violation and "control" over the primary violator.  *See Maher,* 144 F.3d 1302 at 1305.  I am satisfied that plaintiffs have adequately pled facts that could support a primary violation of § 10(b) and Rule 10b-5 by Patric Galvin and i3Carbon.  As for "control," one must remember that control means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405.  Also, as noted in this Order, the controlling person statute is remedial and "has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."  *Maher,* 144 F.3d at 1305.  Particularly in the context of the first few months of operation of a start-up company, and construing the facts alleged and inferences reasonably drawn from those facts construed in plaintiffs' favor, I find that the Amended Complaint states a plausible claim of controlling person liability against Mr. Hanfling and Mr. Syed on which relief could be granted.

The analysis is different with respect to Mr. Sunshine.  The only claim against him is for aiding and abetting liability under the Colorado Securities Act.  First, defendants ask the Court to decline to exercise supplemental jurisdiction with respect to that claim.  However, none of the statutory grounds for declining supplemental jurisdiction applies.  *See* 28 U.S.C. § 1367(c)(1)-(4).  The parties have been waiting three years to have the issues arising out of plaintiffs'

investments in i3Carbon resolved, and it would be inefficient and, frankly, unjust to require them to start over in state court now.

The issues as to aiding and abetting liability are knowledge and substantial assistance. Plaintiffs' allegations that Mr. Sunshine knew of the primary violations of the Colorado Securities Act, and that he provided substantial assistance to i3Carbon and Patric Galvin in achieving the primary violation, Amended Complaint at ¶¶ 57 and 58, are conclusory and are entitled to no weight. That leaves the facts, as pled, that Mr. Sunshine was an advisor to the company and its principals, a member of its "Board of Advisors," and a participant in providing material information for the investment binders and in the drafting of the binders. It would take a quite liberal view of inferences that might be drawn from those facts to find that plaintiffs sufficiently pled that Mr. Sunshine knew that another person was engaging in conduct that would constitute fraud or other unlawful conduct in the sale of a security. Had a Rule 12(b)(6) motion been timely filed, the Court might have granted it.

But it was not timely filed, and I decline to reach the issue in the guise of a Rule 12(c) motion for the reason that follows.

3. <u>Contemporaneous Summary Judgment Motion</u>.

These defendants filed their Rule 12(b)(6) motion and their motion for summary judgment on the same day, April 17, 2015. ECF Nos. 71 and 72. There might be situations where that is appropriate, but this is not one of them.

The Court decides whether a complaint states a claim on which relief can be granted by looking at the allegations in the complaint, sometimes augmented by documents attached to the complaint or unquestionably central to the issues raised in the complaint. Generally, if the Court

considers matters outside the pleadings, the motion must be treated as a motion for summary judgment.  Rule 12(d).

If the Court considered matters outside the pleadings here, there would, in effect, be two largely duplicative motions for summary judgment by these defendants.  If the Court did not consider matters outside the pleadings, it would essentially have to close its eyes to the reality of what has developed over the course of the investigation and discovery in the case, including some of the facts presented by other parties' motions for summary judgment and even discussed in this Order.  Once the facts are developed and the issues are presented in a Rule 56 motion for summary judgment, a Rule 12(b)(6) or a Rule 12(c) motion takes on a "gotsha" quality that I do not favor.  I hope to discourage this practice in future cases that might land on my docket.

Because the issues are fresh in my mind, I have extended my discussion of the motion to dismiss beyond a simple denial as untimely.  I did this without prejudice to the motion for summary judgment.  I will consider that motion after receiving defendants' reply brief.

## ORDER

1.  Defendant Patric Galvin's Motion for Partial Summary Judgment (in which defendant i3Carbon joins) [ECF No. 66] is DENIED.

2.  Defendants Christopher Galvin and Rebecca Galvin's Motion for Summary Judgment [ECF No. 67] is GRANTED IN PART AND DENIED IN PART.  It is granted as to the claims against Rebecca Galvin contained in the Second, Fourth and Fifth Claims for Relief.  It is denied as to the claims against Christopher Galvin contained in the Second and Fourth Claims for Relief.

3.  Defendants Patric, Christopher and Rebecca Galvin's Joinder in the Motion to Dismiss of defendants Robert Hanfling, Faisal Syed and David Sunshine [ECF No. 68],

characterized by the electronic filing system as a "motion," is noted, but to the extent is might be considered to be a motion to dismiss for failure to state a claim, it is DENIED.

4.  Defendant i3Carbon, LLC's Motion for Partial Summary Judgment [ECF No. 69] is DENIED.

5.  Defendants Robert Hanfling, Faisal Syed and David Sunshine's Motion to Dismiss [ECF No. 71] is DENIED.

DATED this 12th day of June, 2015.

BY THE COURT:

R. Brooke Jackson
United States District Judge